# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 15-0610

═══════════════

LEAH ANNE GONSKI MARINO, M.D. F/K/A LEAH ANNE GONSKI, M.D., PETITIONER,

v.

SHIRLEY LENOIR, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF SHANA LENOIR, AND CHRISTOPHER MCKNIGHT, INDIVIDUALLY AND AS
NEXT FRIEND OF NAYLA MCKNIGHT, RESPONDENTS

═══════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════

**Argued February 16, 2017**

JUSTICE WILLETT delivered the opinion of the Court.

In this case, a resident physician sought dismissal of a malpractice claim on grounds that she was an employee of a governmental unit. We agree with the court of appeals that the physician did not establish that she was an employee under the relevant provisions of the Texas Tort Claims Act. We therefore affirm the judgment of the court of appeals.

## I. Background

Shana Lenoir received prenatal care at the University of Texas Physicians Clinic in Houston. She was pregnant with twins and was seen by Dr. Leah Anne Gonski, a second-year medical resident. Gonski prescribed weekly progesterone injections, and a nurse gave Shana the first such injection at the clinic. Shana experienced breathing difficulties, and she and her unborn

children died. Shana's mother and the father of Shana's living child (collectively Lenoir) brought a medical malpractice suit against Gonski and other defendants.

Gonski was in a residency program in obstetrics and gynecology offered by the University of Texas Health Science Center at Houston (UTHSCH). Dr. Pamela Promecene, the program director of this residency program, attested that the program is accredited by the Accreditation Council of Graduate Medical Education (ACGME).[1] She stated that this residency program is sometimes called UTHSCH's Memorial Hospital or MMH program, because it is sponsored by UTHSCH and its "primary clinical site" under ACGME guidelines is Memorial Hermann Hospital in Houston. The University of Texas System Medical Foundation (Foundation) is involved in the administration of this and other University of Texas residency programs. The Foundation, as set out in its articles of incorporation, is a non-profit corporation. Its authorized powers include the employment of qualified persons to serve as residents or interns on the staff of any hospital owned or operated by the University of Texas System. The Foundation appointed Gonski to the residency program under a contractual "University of Texas System Medical Foundation Notice of Appointment" that was signed by Gonski and the dean of UTHSCH.

Gonski filed a motion to dismiss under the election-of-remedies provision of the Tort Claims Act, specifically section 101.106(f).[2] She claimed this provision entitled her to dismissal because she was an employee of a governmental unit, namely the Foundation, and met other

---

[1] *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 520 (Tex. 2002) ("Medical residency programs are accredited under the general authority of [ACGME].").

[2] TEX. CIV. PRAC. & REM. CODE § 101.106(f).

elements of the provision. The trial court granted the motion.[3] The court of appeals reversed and remanded as to Gonski, concluding that she had not established she was an employee of the Foundation.[4]

## II. Discussion

### A. Standard of Review

The parties submitted evidence in support of and in opposition to Gonski's motion to dismiss. On appellate review, we may consider whether there are issues of material fact that should have precluded the trial court from granting the motion to dismiss.[5] Here we conclude the relevant evidence is undisputed, and our decision largely turns on whether, on these facts, section 101.106 requires dismissal. The question before us, therefore, is a question of statutory construction, and our review is de novo.[6]

### B. The Governing Statutory Provisions

Gonski sought dismissal under section 101.106(f), which provides:

If suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion,

---

[3] The trial court rendered a final judgment in favor of Gonski and another defendant, and severed that judgment, making it final and appealable.

[4] *Lenoir v. Marino*, 469 S.W.3d 669, 687 (Tex. App.—Houston [1st Dist.] 2015). The court of appeals also addressed an appeal of the dismissal of Shana's attending physician, an appeal not before us today.

[5] *See Franka v. Velasquez*, 332 S.W.3d 367, 371 n.9 (2011) (explaining that in seeking dismissal under section 101.106(f), a defendant is asserting a claim of governmental immunity); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 221, 227–28 (Tex. 2004) (explaining that when appellate court reviews appeal of denial of jurisdictional plea asserting sovereign immunity, and evidence was presented to the trial court, appellate court addresses de novo whether evidence raises material issue of fact).

[6] *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Among other elements of this provision is the requirement that the individual defendant be an "employee" of a governmental unit. "Employee" is a defined term in the Act, and means

a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.[7]

### C. Analysis of the Evidence and Our Caselaw

Gonski contends she was an employee of the Foundation under the Tort Claims Act. We agree with the court of appeals that the statute, the evidence, and our caselaw do not support this contention.

The statutory definition of employee of a governmental unit requires that the defendant "is in the paid service" of the claimed governmental unit.[8] Gonski offered proof that she was paid by the Foundation, and Lenoir does not dispute this element. The definition also expressly excludes "a person who performs tasks the details of which the governmental unit does not have the legal right to control." This clause precludes Gonski's claim to employee status under the evidence presented.

Gonski signed a Notice of Appointment whereby she accepted appointment to a residency program in obstetrics and gynecology. The Notice states that the appointment is made under a residency program administered by the Foundation. It states that the resident agrees to abide by

---

[7] TEX. CIV. PRAC. & REM. CODE § 101.001(2).

[8] Lenoir argued to the court of appeals in the alternative that the Foundation was not a governmental unit under the Act. *See* 469 S.W.3d at 681 n.5. Like the court of appeals, we do not reach this issue.

4

the Notice and the Graduate Medical Education Resident Handbook. It further states that the resident "agree[s] to comply with the policies of the [Foundation]." Brent King, the president of the board of directors of the Foundation, confirmed in an affidavit that residents are appointed by the Foundation to staff University of Texas hospitals, the Foundation pays the residents, and residents are required to comply with the Handbook.

The Handbook states that the Foundation provides "administrative and educational functions" for the benefit of residents and the residency programs such as "issuance of paychecks" and "maintenance of records." The Foundation provides malpractice insurance to residents.[9] However, the Handbook states, "The teaching staff will supervise the Resident Physician in a manner designed to facilitate progressively increasing responsibility for patient care according to level of training, ability, and experience. The level of responsibility assigned to each Resident Physician will be determined by the Program Director and/or teaching staff." It provides that residents "are not authorized to leave their rotations without specific approval of their Program Director."

Dr. Promecene attested that she was the Program Director of the obstetrics and gynecology residency program in issue. Promecene stated that she is a full-time employee of UTHSCH, not the Foundation. She explained that the UT clinics, which include the clinic where Gonski treated Shana Lenoir, are under the medical direction of UTHSCH's teaching and medical staff and "are regarded by UTHSCH as internal sites." Promecene further attested:

---

[9] According to Paragraph 9 of the Handbook, "Professional liability insurance ("PLI") for Resident Physicians is provided through The University of Texas System Medical Liability Benefit Plan at no cost to the Resident Physician."

> As the sponsoring institution of the residency program, UTHSCH must provide its residents with a variety of effective educational experiences leading to their development as competent physicians. As anticipated by ACGME guidelines, the residency program I direct fulfills this obligation by assigning its residents to various 'sites' in order to provide the contemplated training opportunities. These assignments are made pursuant to a deliberate and detailed curriculum. UTHSCH's resident handbook requires that its residents accept and perform the duties, responsibilities, and rotations as assigned by the residency program's director.

Thus, the Program Director who works for UTHSCH is responsible for assigning resident rotations and other duties to the resident. Promecene stated that the UT clinics "are staffed exclusively by physicians who are full-time employees of UTHSCH," and that "UTHSCH is, at all time[s], responsible for the quality of medical care" at these clinics.

The Foundation's bylaws provide, at considerable length even for a legal document, that the Foundation does not control physicians like Gonski who work at hospitals not owned by the Foundation. Article VI (referring to the Foundation as "the corporation") states in part:

> 4. All physicians employed by the corporation for the purpose of serving as a member of the staff of any hospital or hospitals that are neither owned nor operated by the corporation shall, in the performance of their duties as members of the staff of such hospital or hospitals, be subject to the direction and control of the hospital or hospitals upon whose staff he serves. No physician employed by the corporation shall serve upon the staff of a hospital not owned or operated by the corporation unless and until the governing body of such hospital shall agree in writing to assume full responsibility for the direction and control of the acts of such physician while serving upon the staff of the hospital and shall further agree in writing to hold the corporation harmless from all liability which may arise out of acts performed by such physician while engaged in the scope and course of his duties as a member of the staff of such hospital. No director, officer, or employee of the corporation shall be authorized to act on behalf of the corporation to direct or control the acts of any physician employed by the corporation while said physician is serving as a member of the staff of any hospital or hospitals not owned or operated by the corporation.
> 5. Physicians employed by the corporation shall have no authority to engage in the practice of medicine for or on behalf of the corporation except at a clinic, hospital, or other facility owned or operated by the corporation.

6

There is no evidence that the Foundation owned or staffed the UT clinic where Shana Lenoir was treated. On the contrary, Promecene attested that the UT clinics are internal sites of UTHSCH, staffed exclusively by physicians who are full-time employees of UTHSCH. In briefing to the trial court and court of appeals, Gonski admitted "the Foundation has not ever, strictly speaking, owned any hospitals, clinics or health care facilities."

Gonski argues that we should not consider the bylaws because the relationship between Gonski and the Foundation is a matter of contract rather than unrelated corporate documents. But her contractual Notice of Appointment states that the resident agrees to comply with the policies of the Foundation. We think the policies of the Foundation would include those set out in a formal governing document of the corporation. Gonski and amici curiae[10] also argue that the above-quoted language from the bylaws, on which the court of appeals relied, does not apply because she worked at a clinic rather than a hospital. But paragraph 5 references a "clinic, hospital, or other facility." While the bylaws are not a model of clarity, we essentially agree with the court of appeals that "[p]aragraphs four and five, when read together, require that a resident working at a location not owned by the Foundation be under the control of the entity operating that location."[11] And regardless, the bylaws are cumulative of other evidence that the Foundation had no control over the details of Gonski's tasks as a medical resident.

---

[10] Texas Alliance for Patient Access, Texas Medical Association, Texas Osteopathic Medical Association, and Texas Hospital Association.

[11] 469 S.W.3d at 679.

In *Murk v. Scheele*,[12] we held that a physician was, for purposes of section 101.106, an employee of the University of Texas Health Science Center (UT). The physician, Murk, was on the UT faculty and practiced at the University Hospital where the plaintiff was treated. The hospital was staffed by UT faculty, residents, and students. As here, there was no dispute that Murk was in the paid service of his claimed employer, and the case came down to whether UT had the right to control the details of his work. We held that Murk was an employee, even though, like all doctors, he "must exercise some independent medical judgment" when treating patients.[13] We held that the control element was met because Murk's "medical decisions in the treatment of patients were subject to regimens prescribed by UT (such as required daily rounds), faculty supervision and review, and in some instances, veto by UT's senior faculty."[14] Applying the reasoning of *Murk*, the evidence in today's case indicates that the details of Gonski's tasks as a resident physician were, under the relevant contract and other documents and in actual practice, controlled by UTHSCH and its physicians, not the Foundation. UTHSCH, through its Program Director and clinic medical staff, controlled the daily rotations, duties, and responsibilities of residents in its residency program. The Foundation paid Gonski and performed certain routine administrative functions such as record-keeping, but we do not think these functions rose to the level of controlling Gonski's daily tasks as a physician, her chosen occupation. The Foundation's own

---

[12] 120 S.W.3d 865 (Tex. 2003) (per curiam).

[13] *Id.* at 867.

[14] *Id.*

bylaws in fact expressly and emphatically disavow any right to control a physician working at any hospital not owned by the Foundation.

In *St. Joseph Hospital v. Wolff*,[15] a physician, Dr. Villafani, was a resident in a general surgery residency program operated by St. Joseph Hospital, a private Houston hospital. Under a program contract, St. Joseph and the Central Texas Medical Foundation established a resident training program at Brackenridge Hospital, a city-owned hospital in Austin. The Brackenridge residency program was described in the program contract as an "integral division" of the St. Joseph residency program.[16] Villafani was assigned to Brackenridge. A patient, Wolff, alleging negligent treatment at Brackenridge, sued St. Joseph and other defendants. While *Wolff* did not concern election of remedies under the Tort Claims Act, we find it instructive because it analyzed whether a resident physician was an employee of a medical foundation. It reasoned that employee (as opposed to independent contractor) status turned on who controlled the details of the employee's work. We held that Villafani was not an employee of St. Joseph and was an employee— specifically a borrowed employee—of the Foundation because of the Foundation's control over the details of Villafani's treatment of Wolff.[17] We noted that under the program contract between St. Joseph and the Foundation, St. Joseph generally "would not control the details of the medical tasks performed by the residents when they are assigned to [the Foundation]," and noted other evidence that control over the details of the resident's medical tasks belonged either to the

---

[15] 94 S.W.3d 513 (Tex. 2002).

[16] *Id.* at 521.

[17] *Id.* at 543 (plurality op.), 544 (O'Neill, J., joined by Phillips, C.J., concurring).

9

resident's attending physician or the Foundation's director of medical education.[18] Another physician, himself a resident, was both the attending physician and the Foundation's director of medical education.[19] Under the reasoning of *Wolff*, the evidence in today's case again indicates that Gonski was not an employee of the Foundation because the details of her work as a resident physician were assigned to and under the supervision of the Program Director and medical staff of UTHSCH.

Gonski stresses that the statutory definition of employee by its terms looks to whether the claimed employer lacked "the *legal* right to control" the defendant. Gonski argues that "legal" control means a formal right to control, in contrast to "actual" control. She and amici curiae argue the Foundation had legal control over her because the Resident Handbook made a part of her contract states that the Foundation "reserve[s] the right to change any requirements affecting the terms and conditions of employment" of the resident physician. We find this argument unpersuasive. Gonski essentially argues that "legal" control means a theoretical right to control as opposed to an actual right to control. We see no reason to adopt such a novel definition. The statute's express focus on the "details" of the employee's tasks suggests a focus on the real or practical, as opposed to theoretical. Moreover, as a general rule of statutory construction, we give words their ordinary and plain meaning.[20] According to Black's, "legal" simply means "[o]f or

---

[18] *Id.* at 543 (internal quotation mark omitted).

[19] *Id.*

[20] *City of San Antonio v. Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).

relating to law," or "[e]stablished, required, or permitted by law."[21] It is not ordinarily used as the opposite of, or in contrast to, actual.

Further, we construe statutory language against the backdrop of common law, assuming the Legislature is familiar with common-law traditions and principles.[22] *Wolff* explained that looking to control over the details of an employee's work is a longstanding common-law basis for establishing an employer-employee relationship, and distinguishing an employee from an independent contractor. Section 101.106(f) also, expressly, distinguishes an employee and independent contractor. *Wolff*, we think, looked to which entity actually controlled the resident under the relevant contract.

Gonski focuses on one provision of a lengthy Handbook stating that the Foundation "reserve[s] the right to change any requirements affecting the terms and conditions of employment" of the resident. This provision generally concerns a legal right to control Gonski's work. But we conclude that, for purposes of section 101.106, a general right to change the terms and conditions of employment should not trump control of the details of Gonski's employment—the relevant statutory inquiry—as provided in the version of the Handbook and other legal documents under which Gonski in reality worked. The evidence shows that the details of Gonski's work were in fact supervised and assigned by UTHSCH personnel, as the Handbook specifies, rather than personnel of the Foundation.

---

[21] *Legal*, BLACK'S LAW DICTIONARY (7th ed. 1999).

[22] *See, e.g., Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009) ("[W]e presume that . . . lawmakers enact statutes with complete knowledge of existing law."); *McBride v. Clayton*, 166 S.W.2d 125, 128 (Tex. 1942) (stating that statutes are presumably enacted with full knowledge of common law, Constitution, and other statutes, and are construed accordingly).

We note that Gonski makes no argument that the Foundation and UTHSCH should be treated as a single entity and that, for purposes of section 101.106, Gonski was both paid by and under the control of such umbrella entity. We do not know whether such an argument could prevail, given the evidence that the Foundation is a separately incorporated entity with its own articles of incorporation and bylaws. Suffice it to say that an argument for disregarding corporate formalities is not made and we will not sua sponte explore it.[23] We also note that, in the trial court, Gonski suggested in her motion to dismiss that the Foundation and UTHSCH are separate entities.[24]

### III. Conclusion

In sum, the evidence demonstrates that Gonski was not an employee of the Foundation under the Tort Claims Act. The court of appeals therefore correctly reversed the trial court's dismissal of Gonski under section 101.106.

We affirm the court of appeals' judgment. We remand the case to the trial court for further proceedings.

---

[23] Nor does Gonski argue that she was an employee under section 101.106 because she was paid by one governmental unit and subject to the legal control of another governmental unit. *See Franka v. Velasquez*, 332 S.W.3d 367, 373 & n.20 (Tex. 2011) (expressing no opinion on validity of such an argument because it was not made).

[24] In her motion to dismiss Gonski argued that the motion "carefully establishes the identity of the Foundation as Dr. Gonski's true employer due, in part, to vague, past opinions addressing the employment status of UTHSCH resident physicians, which have not included an explanation of the relationship between UTHSCH, its residents, and the Foundation." The motion goes on to maintain that UTHSCH "is a component of the UT System and a 'governmental unit' for purposes of the" Tort Claims Act, and that the Foundation "is also a governmental unit" for those purposes.

Finally, we note that the amici curiae separately argue that "[q]ualified immunity is absolutely essential to a resident's medical training" so that residents have a window of time to practice in a structured educational setting without fear of litigation. We do not find this argument compelling. Many residents do not have immunity afforded to governmental employees because they are residents at private hospitals and work under residency programs administered by such hospitals. And of course we cannot rewrite the relevant statute to effect our own public policy goals regarding the best training environment for residents.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** April 28, 2017